BUSH, ADMINISTRATRIX *v.* EVANS.

4-9412                                    236 S. W. 2d 1013

Opinion delivered March 5, 1951.

---

*W. J. Morrow* and *George O. Patterson,* for appellant.

*Wiley W. Bean,* for appellee.

HOLT, J.   August 16, 1949, Dwight and Iva Evans, husband and wife (appellees) filed the following verified joint claim against the estate of George W. Hutson, who died June 6, 1949: "TO: Helen Bush, administratrix of the goods, chattels and credits of George W. Hutson, Deceased, and Garner Taylor, Clerk of the County of Johnson, Clarksville, Arkansas.   May 1, 1946, to February 27, 1949, To services rendered as follows:   Services rendered by Dwight Evans and Iva Evans, husband and wife, as companions, servants, nurse, managers of household, cooking for, shaving, preparing and furnishing 306 meals for deceased in claimant's home, and for general care; said services continuing for a period of 765 days, at the special instance and request of the decedent during the life time, at the express, agreed, and reasonable value of two dollars ($2.00) per day, no part of which said sum has been paid.   TOTAL AMOUNT OF CLAIM:— $1,530, Dwight Evans, Iva Evans.

"Comes the claimants, Dwight Evans and Iva Evans, and upon oath say that the matters and things set out in the foregoing claim are true and correct.   Witness my hand and seal on this 16th day of August, 1949.   (SEAL) Wiley W. Bean, Notary Public, My Commission expires March 15, 1950."

In response to request for "Bill of Particulars," appellees asserted "that said claim is based upon the periods when no one was living in the home of the deceased; that such services were rendered between May 1, 1946, and March 2, 1947; from September 14, 1947, to September 20, 1948, and from October 30, 1948, to February 27, 1949; that claimant, Dwight Evans, shaved the deceased at all times when others lived in the house with him until on or about October 30, 1948, when he and the tenant, Ola Park, had a disagreement."

The administratrix (adopted daughter of deceased) disallowed the claim and on appeal to the Probate Court, Iva was awarded $150, but Dwight was denied any recovery.

The cause is here on appellant's direct appeal and cross appeal of appellees.

While the claim here, as filed and presented, was designated as the joint claim of appellees, as the testimony developed and appeared to warrant, the trial court treated the claim as a separate claim of each spouse. This the court had the right to do, in the circumstances.

Appellees say: "George Hutson, deceased, accepted the beneficial results of claimants' services, and the law implies a previous request and a subsequent promise to pay."

Both appellees testified in this case. Neither had been called by appellant, the opposite party. Their testimony tended to show an oral agreement with the deceased to pay for the services which each claimed to have rendered. Appellant earnestly contends that this testimony of appellees as to any transactions with the deceased was incompetent and violative of § 5154, Pope's Digest, which provides:

"In civil action, no witness shall be excluded because he is a party to the suit or interested in the issue to be tried. Provided, in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate or ward, unless called to testify thereto by the opposite party. Provided further, this section may be amended or repealed by the General Assembly, Sched., § 2, Const."

Since, as indicated, we treat the claims as separate, although Dwight and Iva may be interested in each other's claim, the above statute does not make the testimony of each, on the other's claim, incompetent. § 28-603, Ark. Stats. 1947, provides: "In any civil action in the courts of this State a husband or wife may testify as a

witness in behalf of the other when called as such witness by the other spouse, but cannot be called as a witness by the opposite party. (Acts 1937, No. 320, § 1, p. 1218; Pope's Dige., § 5156.)''

In the recent case of *Meers* v. *Potter*, 208 Ark. 965, 188 S. W. 2d 500, wherein M. H. Potter and Sudie Potter (husband and wife) filed separate claims as against an estate, we said: ''It is first insisted that it was error to permit M. H. Potter to testify about the alleged agreement between deceased and Sudie Potter, and that his testimony for this purpose was incompetent under § 5154 of Pope's Digest and Schedule, § 2, of the Constitution of 1874. It has been repeatedly held that this statute applies only to those who are technically parties to the suit, and is not applicable to parties merely interested in its result. *McRae* v. *Holcomb*, 46 Ark. 306; *Smart, Administratrix,* v. *Owen*, 208 Ark. 662, 187 S. W. 2d 312. In construing the statutes in *McRae* v. *Holcomb, supra,* this court said: 'The constitution establishes a general rule that makes all persons who are of sufficient intelligence and not otherwise disqualified, competent witnesses, irrespective of their participation in the suit, or their interest in the result. But to this general rule there is one exception, *vix*: Where the action is by or against an executor, administrator, etc., and the witness is a party to the record, he shall not speak of personal transactions with the deceased, where, by the nature of the case, the privilege of testifying cannot be reciprocal. But mere interest in the issue to be tried does not disqualify.' M. H. Potter is not a party to the claim of Sudie Potter, and while it is true that he is interested, the statue does not render his evidence incompetent, as to the claim of his wife.''

The burden of proof was on appellees to show facts which would warrant the inference that there was an expressed or implied contract or agreement to pay for the services.

Dwight Evans testified on behalf of his wife that she served the deceased approximately 300 meals. ''The Court: Your husband testified you served something

over 300 meals. What was the value of the meals, each meal? A. I figured it would be $.50 a meal.''

Two of deceased's brothers, O. L. and W. C. Hutson, testified. O. L. Hutson: ''Q. Did you have occasion to visit with your brother during his last years? A. Once a week most of the time before he died. Q. He lived alone? A. Lived alone about 12-18 months. Q. Can you tell the court whether or not Dwight Evans and his wife helped to take care of him? A. I don't know about taking care of him. When I was down there, Dwight was there part of the time. Only thing I knew was that George told me Dwight was awfully good to him, shaved him about once a week, kind of saw about him, about the only ones around there that could see about him. I was there most of the time on Saturday. That is about all I know.''

W. C. Hutson tended to corroborate his brother, and (quoting from his testimony): ''Q. Tell the court whether or not Dwight Evans rendered him a service during those months he lived alone. A. All I can tell is what my brother said, said Dwight Evans was awfully good to him, said he would come down and shave him once a week. That is about all I know. Q. Did he state to you whether or not he visited him frequently? A. Said hardly ever a day passed but what he would be there some time of the day.''

Ellis Bush testified relative to the understanding between appellees and the deceased: ''Q. What do you know about the services Mr. Evans and his wife rendered? A. The only service I know about is that Dwight went down and shaved him once a week, part of the time he cut his hair. Once my wife shaved him, and I shaved him. Q. What did he (meaning Dwight) do with reference to furnishing meals? A. If he ever did, I didn't know it.''

Namon Looper corroborated Mr. Bush's testimony.

Ola Parks testified: ''Q. You have any personal knowledge of what Mr. Evans did before you moved there? A. No, no more than George said he shaved him

for the pasture and barn rent. I shaved him every Saturday and after he went to the hospital.'

Virgil Knight, who had lived across the street from deceased since March, 1946, testified: "Q. Do you know anything about Mr. Evans performing some services? A. Yes sir, I saw him over there. Q. Ever talked to Mr. Evans about the circumstances under which he was performing these services? A. He and Mr. Hutson told me he was using the garden and pasture and barn for his services, shaving him. Q. Mr. Evans told you? A. And Mr. Hutson. Q. Know anything about Mr. Hutson being furnished meals by Mr. Evans other than what Mr. Evans told you? A. Saw Dwight take Mr. Hutson up for meals. Q. You have no interest in this case? A. None."

As to Dwight's claim, much significance is attached to his testimony that about one year before George Hutson died, he, Dwight, purchased some land from the decedent, paying therefor $1,000 cash, and that at the time of this purchase from one-half to two-thirds of the services for which he made claim had already been rendered decedent. "Q. You had rendered part of this service before that time? A. Yes sir. Q. In fact, the biggest part? A. One-half or two-thirds. . . . Q. You paid him $1,000 for it? A. Yes sir. Q. That was after he was indebted to you? A. Yes sir. Q. He owed you, you paid him $1,000. A. Yes sir. Q. Why didn't you deduct the amount he owed you? A. I don't know why."

There was some other evidence that decedent had permitted Dwight the use of a barn, pasture and garden privileges in return for services rendered.

We think it unnecessary to attempt to detail all the testimony. It suffices to say that after reviewing it all, we agree with the findings of the trial court that the preponderance of the competent testimony falls far short of supporting any award, in the circumstances, to Dwight Evans, it appearing that he had been fully compensated for any services by the use of the barn, pasture and garden of decedent.

We also are unable to say that the court's finding that Iva Evans should be awarded $150 for her services, in the circumstances, was against the preponderance of the competent testimony.

Accordingly, the judgment is affirmed on both direct and cross appeal.